## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **BRIAN GARCIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16-CV-819-SMY** |
| | ) | |
| **VIPIN SHAH et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Brian Garcia filed the instant lawsuit under 42 U.S.C. § 1983.  He claims that Defendant Dr. Vipin Shah was deliberately indifferent to his serious health needs between June 30, 2015, and August 11, 2015 during his incarceration at Pinckneyville Correctional Center. (Doc. 67).

This case is before the Court for consideration of Defendant's Motion for Summary Judgment (Doc. 103).  Garcia filed a response in opposition to the motion (Doc. 117)[1] and Defendant replied (Doc 121).  For the following reasons, the motion is **GRANTED**.

### Background

The following material facts are either undisputed or taken in a light most favorable to Plaintiff Garcia as the non-moving party: Garcia is quadriplegic (Doc. 117, Ex. 1 at 16) with

---

[1] Defendant argues that Plaintiff's Response in Opposition to this Motion is untimely and should be stricken under Local Rule 7.1(c)(1)1 (*See*Doc. 121).  In the absence of undue prejudice to the defendant, and consistent with the Court's preference for the disposition of claims on the merits, Plaintiff's response will be considered.

limited strength in his arms and legs (*Id.* at 19).  He was admitted to Pinckneyville infirmary on August 7, 2012 (Doc. 104, Ex. 2 at 196-97).  In Garcia's Intake Examination, he was noted to be quadriplegic, to use suppositories for stool, to use pain and muscle relaxing medication, to use an elevated commode, and to self-change his catheter every six hours (*Id.* at 194-96).  His speech was noted to be normal, and he wore diapers, specialized shoes, and was noted to use a wheelchair (*Id.*).  In the infirmary, Garcia used a transfer board to transfer from his wheelchair to his bed or the commode, a specialized commode, an air mattress, a wheelchair, and catheters and other urination equipment (Doc. 104, Ex. 1 at 50-54).  The infirmary beds had rails that Garcia used to assist in moving his body and for access to a call button to the nurse's station.  He received suppository assistance from the nursing staff (*Id.*).

Defendant, Dr. Shah, was the Medical Director at Pinckneyville from June through August 2015 (Doc. 117, Ex. 2 at 17, 51).  He was responsible for overseeing the medical care and staff at Pinckneyville, tending to patients, and for providing expertise on inmates' medical and mental health (*Id.* at 24).

Dr. Shah saw Garcia on June 8, 2015 for a chronic infirmary care appointment.  Garcia subjectively reported he was "okay" and Dr. Shah noted his vital signs were normal and there was "no distress" on observation.  Dr. Shah diagnosed an eye stye and quadriplegia, and the plan was to continue treatment (Doc. 104, Ex. 2 at 129-30; *See also* Ex. 4).

On June 29, 2015, Garcia was seen at nurse sick call requesting a transfer (he referred to inmate Henderson, with whom he had a disciplinary incident) (Doc. 104, Ex. 4).  The following day, Dr. Shah saw Garcia and determined that he was stable and could be discharged from the infirmary and moved to an ADA cell in the disciplinary segregation unit (*Id*. at 95-97; *See also* Ex. 4 at 555-56).  Garcia reported that he was doing better and could move with help (*Id.*).  Dr.

Shah ordered Garcia to be released with the transfer board. Based on common practice, he believed Garcia would continue to receive medical supplies and equipment in the ADA cell since he did not order them discontinued (*Id.* at 110).

Garcia had access to the following general care and services in the ADA segregation cell:

- From June 30, 2015, to August 11, 2015, nursing staff made daily rounds in the segregation unit, including to Garcia's cell twice per day (Doc. 104, Ex. 3 at 285; Ex. 1 at 111). From June 30, 2015, to August 11, 2015, the nurse practitioner made weekly rounds in the segregation unit, including to Garcia's cell (Doc. 104, Ex. 3 at 286).

- From June 30, 2015, to August 11, 2015, the Physician held weekly call lines in the segregation unit to treat inmates who had been scheduled for appointments (Doc. 104, Ex. 3 at 285-86).

- From June 30, 2015, to August 11, 2015, IDOC security staff made numerous, daily rounds in the segregation unit (Doc. 104, Ex. 3 at 285-86).

- From June 30, 2015, to August 11, 2015, the warden and assistant wardens completed regular rounds in the segregation unit (Doc. 104, Ex. 3 at 287; Ex. 5 at 127).

- Former Warden Lashbrook would expect any security staff, medical staff, administrator, or counselor at Pinckneyville to report complaints that an inmate was not receiving necessary medical equipment to appropriate medical staff (Doc. 104, Ex. 5 at 128).

- From June 30, 2015, to August 11, 2015, Garcia's counselors made regular rounds to the segregation unit and spoke with Garcia (Doc. 104, Ex. 3 at 287). Plaintiff did not complain to his counselor about his alleged failure to receive medical equipment, supplies, or treatment during that time (Doc. 104, Ex. 6 at 28-29).

- Garcia's other counselors made no notes of Garcia having complained to either of them about alleged failure to receive medical equipment, supplies, or treatment between June 30, 2015, to August 11, 2015 (Doc. 104, Ex. 6 at 27).

- Garcia had access to a call button in his ADA segregation cell that would contact IDOC security officers in the segregation unit pod when pushed (Doc 104, Ex. 3 at 190-91).

Garcia was also diagnosed and treated for multiple medical conditions while in the ADA disciplinary segregation cell and received the following interventions:

- On July 6, 2015, Garcia was seen at nurse sick call in the segregation unit complaining of a cut on his left big toe. Garcia subjectively reported he cut his toe on his wheelchair. The wounds were dressed, and dressing changes were ordered for 1 week (Doc. 104, Ex. 2 at 173- 74; *See also* Ex. 4 at 563, 924-25).

- Dr. Shah gave a voice order plan on July 6, 2015, to treat the injury for 1 month with gauze and dressing and to see him or the nurse practitioner in 1 week (*Id.*).

- On July 10, 2015, Garcia refused to attend a treatment line for a dressing change and a refusal was noted in the records (*See* Doc. 104, Ex. 4 at 926).

- On July 11, 2015, Garcia was seen in nurse sick call. Garcia subjectively stated he felt like hurting himself. He was brought to the HCU for crisis intervention, but later confirmed he wanted to come back to the infirmary. The nurse's assessment was abuse of privileges. Plaintiff was returned to segregation and received a disciplinary ticket for abuse of privileges and for lying to staff (Doc. 104, Ex. 2 at 175-76; Ex. 1 at 132-34).

- On July 13, 2015, Garcia was seen by an LPN requesting supplies. Dr. Shah provided a voice order for new supplies on that date (*See* Doc. 104, Ex. 4 at 565).

- On July 19, 2015, Garcia was seen by Dr. Shah. Garcia subjectively reported he had cut himself on the floor. Staff reported to Dr. Shah the Garcia had been digging the injury. Dr. Shah observed and assessed superficial abrasion and noted no drainage. Dr. Shah's treatment plan was to provide triple antibiotic ointment with gauze dressing on the affected area twice per day for two weeks. Dr. Shah also put Garcia on a diuretic twice per day for two weeks. Dr. Shah ordered a follow-up after 2 weeks (Doc. 104, Ex. 2 at 136-38:1-25; *See also* Ex. 4 at 566).

- On July 27, 2015, Garcia refused an appointment to see Dr. Shah for a follow-up (Doc. 104, Ex. 2 at 158; *See also* Ex. 4 at 568).

- On August 1, 2015, Garcia was seen in nurse sick call with subjective complaints of a wound on his buttock. Open wounds were observed on the right buttocks, elbows, and heels. The wounds were cleaned, and gauze was ordered to be applied for 1 week (Doc. 104, Ex. 2 at 140-41; *See also* Ex. 4 at 569).

- When pressure wounds develop, the wounds are cleaned and dressed, and pressure is managed by having the patient move and move often. Infected sores are treated with antibiotics (Doc. 104, Ex. 2 at 124).

- On August 4, 2015, Garcia was seen by Dr. Shah during segregation rounds. Garcia subjectively complained about an open area in his buttocks. Dr. Shah observed Garcia's vital signs were normal, that there was questionable swelling and redness on the left buttock, and a sore with an open area on the right buttock with no drainage. Dr. Shah assessed a questionable decubitus ulcer, advised to clean and dress the area daily, and took a culture of the wound. Dr. Shah also wanted to see Garcia in follow-up the next week and advised him to keep up with his hydration (Doc. 104, Ex. 2 at 141-42:1-24; *See also* Ex. 4 at 569-70).

- On August 8, 2015, Garcia was seen by a nurse. Garcia complained of pain in the left inner-thigh and groin area. Swelling and an edema were noted. The nurse noted Garcia had multiple pressure ulcers and was currently being treated for all. The nurse also noted Garcia was scheduled to see Dr. Shah on August 11, 2015. (Doc. 104, Ex. 2, at 146-47; *See also* Ex. 4 at 569-70). Later on August 8, 2015, Dr. Shah prescribed a round of Keflex to treat the potential infection risk the nurse identified (*Id.*).

- On August 11, 2015, Dr. Shah saw Garcia during his segregation call line with complaints of a red swollen hip after Garcia reported he was hurt moving from bed to another place. Dr. Shah noted the left thigh was red and the skin was excoriated. Dr. Shah assessed a questionable left thigh injury. Dr. Shah determined Garcia needed acute care at that time, and he ordered Garcia to be admitted to the infirmary as a chronic care live-in patient. Dr. Shah ordered that Garcia be placed back in the infirmary and prescribed Ibuprofen 400 mg for 1 week (Doc. 104, Ex. 2 at 149-50; *See also* Ex. 4 at 574-77).

- In his infirmary admission note, Dr. Shah noted the Garcia's condition prevented him from feeling pain. Dr. Shah assessed a left thigh injury. Dr. Shah ordered an x-ray to rule out a fracture (Doc. 104, Ex. 2 at 151-53; *See also* Ex. 4 at 577). On August 12, 2015, Garcia was diagnosed with a fracture to his left hip and femur and was transferred to Carbondale Hospital (Doc. 104, Ex. 2 at 154-57; *See also* Ex. 4 at 588-94).

## Discussion

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue as to any material fact – that is where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). If the evidence is merely colorable or is not sufficiently probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine

issue of material fact must be resolved against the moving party.  *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

Prison officials violate the Eighth Amendment if they are deliberately indifferent to a serious medical need.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016).  To prevail on such a claim, an inmate must show that he 1) suffered from an objectively serious medical condition; and 2) that the defendant was deliberately indifferent to a risk of serious harm from that condition. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016).  An objectively serious condition includes an ailment that has been "diagnosed by a physician as mandating treatment," one that significantly affects an individual's daily activities, or which involves chronic and substantial pain. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).  It is undisputed that Chambers suffered from a serious medical condition.  As such, Garcia must prove that Dr. Shah knew of but disregarded the risks associated with his condition.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Garcia contends that he had limited access to healthcare in the ADA segregation cell, including lack of 24-hour health care, an air mattress, bed rails, or a transfer board.  He argues that Dr. Shah was indifferent to his limited mobility and the related risks of his health condition when he transferred him to an ADA segregation cell even though he needed the type of care provided in the infirmary.  Specifically, he argues that Dr. Shah knew of the risks associated with moving him out of the infirmary but failed to take reasonable measures to abate the risk to his health condition.

In *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017), the Seventh Circuit emphasized the deference owed to the professional judgment of medical providers and noted, "we have observed that '[b]y definition a treatment decision [that is] based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant

believed to be the best course of treatment.'" *Id*.   The court then concluded, a "medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*.

The record reflects that Dr. Shah believed Garcia was stable enough to be discharged to the ADA cell with use of his transfer board and the same medical equipment as in the infirmary, which he ordered. And, although Garcia did not have a call button that went directly to the nurses' station, he had access to a call button in his segregation cell that would contact IDOC security officers in the segregation unit pod when pushed.

Garcia was regularly evaluated by medical personnel while in segregation and was regularly observed by IDOC staff, including his counselors.  Garcia had access to written sick call and grievance procedures and was seen by various medical staff twice per day during medication rounds, the nurse practitioner weekly.  Garcia was also seen by Dr. Shah when he was placed on the physician call line.  In sum, Garcia has produced no evidence that Dr. Shah departed from a physician's standard of care, practice, or standards by discharging him to an ADA cell.

Garcia next alleges that Dr. Shah was indifferent to his limited mobility and the related risks of his health condition because he rubberstamped the disciplinary committee's recommendation to place Garcia in segregation only five days after an adjustment committee determined Garcia had committed a disciplinary violation earlier that month. Again, relying on *Rasho*, Garcia relies on *Rasho*, he argues that Dr. Shah chose an "an easier and less efficacious treatment" not based on medical judgment.  856 F.3d 469, 476 (7th Cir. 2017) (opining that a

doctor's "choice of 'an easier and less efficacious treatment without exercising professional judgment' can constitute deliberate indifference.").

Garcia's reliance on *Rasho* is misplaced. Like the instant case, *Rasho* involves an inmate who was transferred into segregation where his condition deteriorated. The Seventh Circuit's determination turned on whether the transfer was based on "an exercise of medical judgment," or rather on the inmate's "disruptive . . . behavior" in the health unit. The key evidence in *Rasho* was the plaintiff's testimony that the defendants explicitly told him they were transferring him "in response to his complaints." *Id*. at 476. This testimony was sufficient to create a factual dispute regarding whether the reason for the transfer recommendation was "retaliation" rather than a decision resting on medical judgment. *Id*. This case is factually distinguishable from *Rasho* – there is no evidence suggesting that Dr. Shah's decision was motivated by spite, personal prejudices, or animosity.

Lastly, Garcia argues that Dr. Shah was indifferent to his limited mobility and the related risks of his health condition because his condition worsened in segregation and Dr. Shah delayed treatment and failed to alter his treatment plan. Specifically, he alleges that he was developing pressures ulcers and sores (Doc. 117, Ex. 2 at 141-42); he had a wound on his elbow (*Id.* at 136-37); had an open area on his buttocks, left buttock redness and questionable swelling, and an open sore on his right side (*Id.* at 142-43).

While the medical records demonstrate that Garcia's condition deteriorated after he was discharged from the infirmary, there is no evidence that Dr. Shah provided less than minimally competent care during that period. Instead, the record indicates that Dr. Shah and nurses provided significant medical care including, examinations, medications, dressing changes, voice orders, and referral to follow-up appointments (some of which Garcia sometime refused to attend).

It is evident that Garcia wanted and requested different treatment. But the law does not entitle him to specific medical care or even the best care possible; he is only "entitled to reasonable measures to meet a substantial risk of serious harm." *Forbes v. Edgar*, 112 F.2d 262, 267 (7th Cir. 1997).

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 103) is **GRANTED**.  The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close this case.

**IT IS SO ORDERED.**

**DATED: September 29, 2021**

**STACI M. YANDLE**
**United States District Judge**